* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or non-joinder of parties.
3. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
4. An employer-employee relationship existed between defendant-employer and plaintiff.
5. Amerisure Insurance Company was the carrier on the risk.
6. Plaintiff's average weekly wage was $ 464.57, which generates a compensation rate of $ 309.71 per week.
7. The plaintiff had a compensable injury by accident to his right eye on May 15, 2003 when he was struck in that eye by a 2X4.
In addition, the parties stipulated into evidence the following:
1. Order Approving Compromise Settlement Agreement and the settlement agreement.
2. Letter from Mr. King to Mr. Simmons dated January 21, 2005.
3. Letter from Peggy Humphrey to plaintiff dated January 19, 2005.
4. Plaintiff's discovery responses.
5. Four job analysis forms.
6. A packet of medical records and reports which were submitted November 30, 2005.
The Pre-Trial Agreement dated June 30, 2005, which was submitted by the parties, is incorporated by reference.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who is fifty-eight years old and who has an eighth-grade education, began working for defendant construction company as a carpenter in 2002. He also operated a backhoe from time to time. His job involved building forms for concrete and pouring concrete into footers. The job involved some ladder climbing and use of a skill saw. Plaintiff can read and write but cannot read blueprints without assistance.
2. On May 15, 2003 plaintiff sustained a compensable injury by accident when a board struck him in the right eye. Dr. Butera examined him that day and found that he had a large corneal abrasion, some evidence of bleeding inside the eye and evidence of dislocation of the lens. She prescribed topical medications and advised him to rest. He then followed-up with Dr. Wilshire, his regular ophthalmologist, who treated him with medications. Dr. Wilshire noted that he was beginning to develop a cataract on his lens and that the lens was loose. Since that condition could lead to further complications, including glaucoma, the doctor referred him to Duke Medical Center.
3. Dr. Jaffe, an ophthalmologist specializing in vitreoretinal diseases at Duke, evaluated plaintiff on July 18, 2003. His examination revealed damage to the area where fluid normally drains out in the front of the eye, a cataractous lens, which was mobile, and vitreous gel leaking to the front of the eye. There was also an area which looked suspicious for a retinal tear, but it was not very visible due to the cataract. As an incidental finding, there were spots on the retinas of both eyes, which could have been congenital or could have been due to a prior toxoplasmosis infection. Based upon the findings, Dr. Jaffe recommended cataract surgery from a different approach than normal in order to remove and replace the lens and to check for a retinal tear.
4. The surgery was performed on August 21, 2003 by both Dr. Jaffe and Dr. Carlton, the doctor who replaced the lens. During the operation the physicians were unable to determine whether or not there was a retinal tear. Approximately two weeks after the operation, however, a retina tear was found, so on September 10, 2003 Dr. Jaffe performed another procedure to freeze the torn area and to place a gas bubble in the eye in order to flatten the retina. Following that procedure, there was initially evidence of healing but then plaintiff's interocular pressure dropped. It appeared that he had a retinal detachment, so Dr. Jaffe recommended another operation. That surgery was performed on October 23, 2003. The doctor did find another retina tear as well as some scar tissue which had started forming on the retina.
5. After the third procedure, plaintiff was followed at Duke for a month and then by Dr. Wilshire locally. Dr. Jaffe also saw him in February, June and October 2004. By the time of the June evaluation, plaintiff's right eye was stable but his visual acquity was only 20/250, which meant that he was legally blind in that eye. Although his retina appeared to be intact, there was apparently significant scarring of the retina. Dr. Wilshire treated him for flare-ups of iritis. However, his interocular pressure stabilized within normal limits and did not require further treatment.
6. Plaintiff reached maximum medical improvement by November 10, 2004 with respect to his eye injury.
7. During the course of treatment for his right eye injury, plaintiff developed high blood pressure and diabetes, conditions which require treatment and medical monitoring. Whenever plaintiff rushes to do something he gets the shakes and has to sit down and wait it out. Sometimes he has to sit for an hour, sometimes longer, before he can go about his business again.
8. Prior to the injury in question, plaintiff had been treated for cholesterol, triglycerides, and sleep apnea. He had also had abnormal electrocardiograms. In September 2003 while being treated for his eye injury, he went to the emergency room for chest pain and subsequently saw Dr. Johnson, his internist, on September 15. By the time of that appointment, testing at Duke had demonstrated high blood sugar readings. Dr. Johnson and his staff treated him with medication for hypertension and diabetes.
9. By February 2004 plaintiff's symptoms of chest pain and shortness of breath had increased and, considering the fact that he had a strong family history of heart disease, he was a heavy smoker and he had diabetes, Dr. Johnson's physician's assistant decided to order an exercise stress test. The test was performed on February 20, 2004 and it provoked significant angina. There were also perfusion defects demonstrated. Consequently, plaintiff was advised to go get a cardiac catheterization as soon as possible. He went to the Veterans Administration Hospital for the procedure. Plaintiff was deemed to be at a high risk for heart attack.
10. At the time of the injury in question, defendant-employer coincidentally had another employee by the name of Robert Pickett who was blind in one eye. Pickett had had the visual impairment for approximately 10 years when he was hired. His job was concreter finisher. Under the circumstances, the company had two jobs evaluated so that the job descriptions could be prepared and submitted to plaintiff's physicians. The positions that were available were rough carpentry and concrete utility worker. Pickett testified that although he was blind in one eye he was able to do both jobs. However, he had 10 years to accommodate to being blind in one eye prior to the time he was employed by defendant-employer. Also, he was not subject to the other deficits exhibited by plaintiff. Therefore, his testimony is not conclusive proof that the two jobs were suitable for plaintiff.
11. A rough carpenter would lay out the building or parking lot according to specifications, build forms for footers and install doors and windows. The job required use of hand and power tools. The utility worker position involved measuring, driving stakes and stretching line between them, helping to build and align forms, leveling ground and leveling freshly poured concrete to the specified thickness.
12. The two job descriptions were sent to Dr. Wilshire, who approved of both of them with respect to plaintiff's eye condition but commented that plaintiff's depth perception would be affected by his loss of vision in his right eye so that he should stay away from hazardous spaces or machinery. It appeared that regular use of a power saw would not be advisable, at least initially. Plaintiff should not spend time off the ground at the work site and he would have difficulty in determining a straight line.
13. Dr. Jaffe noted that plaintiff's depth perception would be affected and that some people adapted to the changes better than others. Dr. Jaffe also explained that plaintiff would not qualify for a commercial driver's license, although he would be able to get a standard driver's license. He deferred to Dr. Wilshire with respect to suitability of the jobs.
14. Defendant C Construction Company offered plaintiff two positions to return to work to in December 2004. One position was that of "carpenter" and the other was "utility worker". According to Peggy Humphrey, safety manager for the employer, both positions would require plaintiff to work on uneven ground, have to use power tools, be around heavy equipment and negotiate either ladders or staircases to perform the job. Ms. Humphrey was not aware of plaintiff's other medical conditions and did not take into account any restrictions from those conditions when she offered the jobs. Additionally, neither of the eye doctors indicated they took into consideration plaintiff's other medical conditions when they considered whether plaintiff could perform the jobs with respect to his eye condition.
15. By letter dated January 19, 2005, plaintiff was requested to report for work on January 24, 2005. Plaintiff subsequently responded through counsel that he was concerned for his safety and the safety of others so he would not accept the proffered jobs. He did not report to work for the company on January 24 or on any other day prior to the date of hearing.
16. Plaintiff's age, education and prior job experience qualify him only for construction type jobs. His blindness in one eye, inability to read blueprints without help, inability to determine a straight line, inability to climb ladders or work above ground level, inability to work around machinery, and inability to use power tools combined with his hypertension, diabetes, sleep apnea and high risk for heart attack rendered him incapable of holding a job in construction. Accordingly, plaintiff's declining to accept the two construction jobs was reasonable.
17. Where, such as here, plaintiff's disability has been accepted by the employer and it has been shown that the compensable disability combined with non-compensable disabilities that cannot be apportioned make the proffered jobs unreasonable, defendants have not shown that there are jobs available in the marketplace that plaintiff can obtain.
18. Pursuant to N.C. Gen. Stat. § 97-3(19), which provides that 85% or more loss of vision constitutes industrial blindness, plaintiff has sustained 100% loss of his right eye with Dr. Wilshire's rating of 97% permanent partial impairment. The Industrial Commission Rating Guide provides that visual acuity of 20/240 constitutes 86% permanent partial impairment. Since plaintiff had no better than 20/250 vision when he reached maximum medical improvement, his impairment under the Rating Guide would also qualify as total industrial blindness in the eye under the statute. However, he has not specifically made an election of remedies for permanent disability as between his rating or actual wage loss, should he be able to prove actual wage loss in the future.
19. Plaintiff will likely require ongoing medical monitoring and treatment of his right eye due to the injury at work.
20. Because of his compensable injury, plaintiff has not been able to earn wages in any employment since July 18, 2003.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The two construction jobs offered by defendants to plaintiff were not suitable work. Defendants have not shown that plaintiff's disability has ended. N.C. Gen. Stat. § 97-32.
2. Whenever compensable injuries combine with non-compensable conditions to render a proffered job unreasonable, plaintiff has not refused suitable employment when he declines to accept the proffered employment. Counts vs. Black Decker, 121 N.C.App. 387, 465 S.E.2d 343
(1996). In Counts the Full Commission found, and the Court of Appeals affirmed on appeal:
 "Defendant has offered plaintiff three jobs which are within her restrictions if only the condition of her arms is considered. However, due to a combination of the continuing impairment to her arms and an unrelated, severe arthritic condition of both hands, plaintiff is unable to perform the jobs offered to her and is unable to be gainfully employed at any other occupation."
Said the Court in Counts:
 "Our courts have held that where a claimant is rendered totally unable to earn wages, partially as a result of a compensable injury and partially as a result of a non-work-related medical condition, the claimant is entitled to an award for total disability under G.S. § 97-29. Weaver v. Swedish Imports Maintenance, Inc., 319 N.C. 243, 354 S.E.2d 477 (1987); Errante v. Cumberland County Solid Waste Management, 106 N.C.App. 114, 415 S.E.2d 583 (1992)
3. After plaintiff proves disability, the burden shifts to defendants who must show that plaintiff is employable. Radica v. CarolinaMills, 113 N.C.App. 440, 447, 439 S.E.2d 185, 190 (1994). An employee's release to return to work is not the equivalent of a finding that the employee is able to earn the same wages earned prior to the injury, nor does it automatically deprive an employee of the benefit of the presumption of continuing disability. Kisiah v. Kisiah Plumbing,124 N.C.App. 72, 81, 476 S.E.2d 434, 439 (1996), disc. review denied, 345 N.C. 343, 483 S.E.2d 169 (1997). Mere proof of a return to work is insufficient to rebut the presumption because capacity to earn is the benchmark test of disability. Stamey v. North Carolina Self-InsuranceGuar. Ass'n, 131 N.C.App. 662, 507 S.E.2d 596 at 599 (1998) (citing.Kisiah, 124 N.C.App. at 81, 476 S.E.2d at 439).
4. Once disability entitling injured employee to workers' compensation benefits has been established, the employee is cloaked in the presumption of disability, and the burden is on the employer to rebut that presumption, which the employer may do through medical and other evidence, including evidence that suitable jobs are available to the employee and that the employee is capable of getting one, taking into account the employee's age, education, physical limitations, vocational skills, and experience. N.C. Gen. Stat. § 97-2(9). Stamey, supra.
5. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including ongoing medical monitoring and treatment by Dr. Wilshire. N.C. Gen. Stat. §§97-2(19); 97-25.
4. Defendants are responsible for an assessment of $ 750.00 to the Industrial Commission's Second Injury Fund since this case involves total loss of use of a major member. N.C. Gen. Stat. § 97-40.1(a).
5. Plaintiff is entitled to compensation at the rate of $ 309.71 per week from July 18, 2003, and continuing.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Subject to the attorney's fees set forth below, defendants shall pay to plaintiff $ 309.71 per week from July 18, 2003, and continuing until further orders of the Industrial Commission. Such compensation as shall have accrued shall be paid in a lump sum.
2. Defendants shall pay directly to plaintiff's attorney 25% of the lump sum set forth in Paragraph 1 of the Award and shall thereafter pay directly to plaintiff's attorney every fourth check.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, including those arising from necessary future treatment by Dr. Wilshire.
4. Defendants shall pay an assessment of $ 750.00 to the Second Injury Fund.
5. Defendants shall pay the costs.
This 21st day of September 2006.
 S/___________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER